IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)

| | |
|---|---|
| **TAMEKA PRIDGET,** *et al.*, | * |
| **Plaintiffs,** | * |
| v. | *   **CIVIL ACTION NO. _____** |
| **BALTIMORE CITY BOARD** | * |
| **OF SCHOOL COMMISSIONERS,** *et al.*, | |
| | * |
| **Defendants.** | |
| | * |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR TEMPORARY
RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

## I.      INTRODUCTION

This request for a temporary restraining order and preliminary injunction seeks to

remedy illegal barriers to education imposed on homeless students in Baltimore City.  Federal

law requires public school systems like Defendants' to guarantee homeless students full access to

education and the opportunity for school continuity and success.  In violation of this law, and in

the face of years of public pressure and the pleas of individual homeless students and families,

Defendants have erected or perpetuated barriers to these students' achievement.  Defendants'

policy or practice has subjected the named Plaintiffs and countless other homeless students and

families to educational disruption, social stigma, and financial distress.

Plaintiffs are six school-aged children, T.W., J.G., and X.M., T.M., F.S., and B.S., and

their mothers, Tameka Pridget, Tamitha Grinder Creasey,[1] and Ariel Mason.[2] *See* Declaration of

Tameka Pridget ("Pridget Decl."), attached as Ex. 1; Declaration of Tamitha Grinder Creasey

("Grinder Decl."), attached as Ex. 2; Declaration of Ariel Mason ("Mason Decl.") attached as

Ex. 3.  Whether through loss of a job, loss of family support, or other difficult circumstances,

each Plaintiff parent has found herself and her children without permanent housing.  Despite

their homelessness, these parents have strived to support their children's stability and success in

school, relying in large part on the protections afforded by the McKinney-Vento Homeless

Education Assistance Improvements Act of 2001, 42 U.S.C. §§11431-11435 (2002) (hereinafter

McKinney-Vento or the Act).  They have, however, encountered resistance from Defendants

who have systematically violated their rights and those of their children under McKinney-Vento.

Defendants have, for instance, failed to provide legally-mandated transportation to

Plaintiff T.W., age nine, and Plaintiff J.G., age eight, so that they can remain at their schools of

origin, respectively James Mosher Elementary and Curtis Bay Elementary.  Consequently, both

T.W. and J.G. have already missed at least two days of school this year and have been late on

several other occasions, and have not missed much more only because their parents, respectively

Plaintiff Tameka Pridget and Plaintiff Tamitha Grinder  have spent countless hours and their

extremely limited funds taking them to and from school.  Meanwhile, Defendants have failed to

furnish Plaintiffs X.M., T.M., F.S., and B.S. with mandatory school uniforms, despite the

---

[1] Tamitha Grinder Creasey prefers to use her birth name as her last, so she is referred to
hereinafter as "Ms. Grinder."

[2] Plaintiffs are simultaneously filing a Motion for Class Certification and Memorandum in
support thereof.

inability of their mother, Plaintiff Ariel Mason to afford them, thus causing X.M. to miss a full

four days of school and his siblings to face the day-to-day stigma of announcing their poverty

through their lack of appropriate clothing.  Creating further risk of exclusion, Defendants have

asked Ms. Mason to pay a $20 total fee so that F.S. and B.S. can join their class on a field trip,

despite their knowledge of her homelessness, and they have so far refused to wave the fee in

response to her request.  These harms are the result of a policy, custom pattern or practice of

failure to comply with McKinney-Vento.

Accordingly, pursuant to Fed. R. Civ. P. 65, Plaintiffs move this Court to issue a

temporary restraining order requiring Defendants to (1) provide timely, safe and adequate

transportation to Plaintiffs T.W. and J.G. so that they can continue to attend their schools without

further disruption; (2) furnish Plaintiffs X.M., T.M., F.S., and B.S. each with a sufficient number

of uniforms to last the school week and ensure that they are not removed from school for lack of

a uniform; (3) allow Plaintiffs F.S. and B.S. to participate in their school field trip on September

26 without need to pay a participation fee.  Additionally, as representatives of proposed classes,

Plaintiffs move for an order enjoining Defendants preliminarily and permanently from violating

McKinney-Vento.

## II.    THE McKINNEY-VENTO STATUTORY FRAMEWORK

McKinney-Vento guarantees children and youths experiencing homelessness "equal

access to the same free, appropriate public education, including a public preschool education, as

provided to other children and youths," so that they "have an opportunity to meet the same

challenging State student academic achievement standards to which all students are held."  42

U.S.C. § 11431(1) and (4).  "Homeless" is defined broadly to refer to all children who, whether

they are with a parent or unaccompanied, "lack a fixed, regular, and adequate nighttime

residence," including (but not limited to) those who are sharing the housing of other persons due

to loss of housing, economic hardship or a similar reason; living in motels, hotels, trailer parks,

or camping grounds due to the lack of alternative adequate accommodations; living in

emergency or transitional shelters; living in a public or private place not designed for or

ordinarily used as a regular sleeping accommodation for humans; living in cars, parks, public

spaces, abandoned buildings, substandard housing, bus or train stations, or similar settings; and

children who are awaiting foster care placement. 42 U.S.C. §11434a(2)(A). In furtherance of its

objective of ensuring equal access and opportunities for success for this vulnerable population,

the law directs local education agencies (LEAs), like City Schools, to proactively "remove

barriers to the enrollment and retention of homeless children and youths."  42 U.S.C. §

11432(g)(1)(I).  This mandate encompasses several specific obligations.

Foremost, LEAs must promote school continuity among homeless students.  A homeless

student must be allowed to continue to attend the school of origin [the school he or she last

attended, or attended before becoming homeless] for the duration of homelessness, or for the

balance of the school year if the child becomes permanently housed during the school year.  42

U.S.C. §§ 11432(g)(3)(A)(i); 11432(g)(3)(G).  LEAs must also provide transportation to

homeless students exercising that choice.  *Id.* at § 11432(g)(1)(J)(iii).  Where it is in the best

interests of a homeless student to transfer from the school of origin to a new school, McKinney-

Vento directs the LEA to immediately "enroll" the student – that is, ensure that he or she is

"attending classes and participating fully in school activities," 42 U.S.C. § 11434a(1) – without requiring the student to present the usual documentation, such as proof of residency and immunization records, and provide transportation if transportation is available to other students at that school.  *Id.* at §§ 11432(g)(3)(C); 11432(g)(4)(A).  McKinney-Vento further mandates that, once a homeless child is in school, the LEA must ensure that he or she has access to "comparable services" and all "school activities" available to housed students.  *Id.* at § 11432(g)(4); *see also* 42 U.S.C. 11434a (defining "enrollment" as not merely registered but "attending classes and participating fully in school activities").  Simply permitting homeless students to participate in school-related activities, including not just classes but field trips and extracurricular activities, is inadequate.  LEAs must also eliminate barriers to participation – either procedural, such as sign-up deadlines, or financial, such as costs associated with school uniforms and fees for field trips and extracurricular activities – which prevent homeless students from being fully involved, and without stigma.  *See* 42 U.S.C. § 11432(g)(1)(I) (broad mandate to remove all "barriers" to homeless students' enrollment and retention); *id.* at 11432(g)(1)(H)(v) (identifying "uniform or dress code requirements" as one "problem" confronting homeless students); *id.* at 11432(g)(1)(J)(i) (requiring LEAs to "adopt policies and practices to ensure that homeless children and youths are not stigmatized or segregated on the basis of their status as homeless"); *see also* UNITED STATES DEPARTMENT OF EDUCATION, MCKINNEY-VENTO EDUCATION FOR HOMELESS CHILDREN AND YOUTH: SCHOOL ENROLLMENT GUIDELINES 10700 (2002)[3] (hereinafter "Federal Enrollment Guidelines") (identifying "school-related fees" as a

---

[3] *Available at*, http://www2.ed.gov/legislation/FedRegister/other/2002-1/030802a.html (last

deterrent to homeless students' full participation in school activities).

Given the breadth and scope of responsibilities under McKinney-Vento, the Act requires LEAs to "designate an appropriate staff person" to act as the school district's homeless liaison. *Id.* at § 11432(g)(1)(J)(ii).  The homeless liaison is charged with ensuring that "homeless children and youths are identified by school personnel and through coordination with other entities and agencies."  *Id.* at § 11432(g)(6)(A)(i).  In order to ensure complete implementation, the liaison is also charged with widely disseminating information of importance to homeless students and families.  The liaison must ensure, for instance, that notice regarding homeless students' educational rights is made available in places frequented by homeless families, including schools.  *See id.* at § 11432(g)(6)(A)(iv)-(v).  In particular, the liaison is further charged with ensuring that parents and guardians are "fully informed of transportation services, including transportation to the school of origin . . . and [are] assisted in accessing transportation to the school that is selected . . . ."  *Id.* at § 11432(g)(6)(A)(vii). Within Baltimore City Public Schools, this position is the Homeless Education Associate (HEA).

## III.   FACTS

### A.     Plaintiff T.W. and Tameka Pridget[4]

For the past two years, T.W. has attended James Mosher Elementary, the neighborhood school near the home where he used to live with his brother, K.P. , and mother, Tameka Pridget. In July 2013, Ms. Pridget lost her job as a medical technician and could no longer afford the rent,

---

visited September 16, 2013)

[4]  The facts regarding T.W. are detailed in Ex.1, Pridget Decl.

leading to the family's eviction and move into the Marian House, a transitional shelter for women with children.  Despite the move, Ms. Pridget wanted to keep T.W. at James Mosher, where he had many friends and had been making good academic progress as a result of special education interventions that had recently been put in place.

Transportation has operated as a barrier to T.W.'s continued enrollment.  On or about July 11, 2013, a staff person from Marian House submitted a request for transportation to Baltimore City Public Schools on behalf of all the students in the facility according to the instructions she received from the school system's HEA.  The request included T.W. but it incorrectly listed his name as "Keshon Pridget."  Since the request was submitted over six weeks before the start of school and included contact information for the shelter and name of the parent, City Schools had ample time to discern and follow up on the error before the school year began, but no one from the school system contacted the shelter or Ms. Pridget to inquire about the issue. On August 23, the last day before school started, staff at the Office of Transportation did reach out to Ms. Pridget and the Marian House to confirm the transportation arrangements and it was at that time that Ms. Pridget discovered that T.W. was not on a list to receive transportation at all.

Rather than attempting to resolve the problem with transportation at this point, despite the fact that this was the last weekday before school began, the Office directed Ms. Pridget to call her son's school, thus launching her on what can only be described as a bureaucratic wild goose chase, which continues to this day.  Since August 23, Ms. Pridget has been doggedly attempting to obtain transportation for T.W., only to be met with delay, disorganization, and foot-dragging from the school system as follows:

- On August 23, Ms. Pridget left messages for Ms. Johnson, an assistant principal at T.W.'s school, and the HEA, but did not receive a response.

- On August 26, when transportation did not arrive for T.W., Ms. Pridget again called Ms. Johnson.  She was asked to come to the school in person to complete a written transportation request, which she did.  Ms. Johnson advised her it would take ten days to process.

- Also on August 26, Ms. Pridget's attorney contacted the HEA to advise her of the situation and seek assistance with expediting the request.

- On September 6, transportation still not having begun, Ms. Pridget contacted the Office of Transportation again and was told T.W. is still not in their system.  She left a message with the school once more to follow up.

- On September 10, Ms. Pridget's attorney followed up again with the HEA.

- On September 12, Ms. Pridget contacted the Office of Transportation a third time and was told that T.W. had finally been entered into their system, but that it would take at least seven additional days until transportation began.

As of the date of this filing, more than three weeks after Ms. Pridget's request to the school on August 26 and nine weeks after the shelter's request on July 11, T.W. remains without any school-provided transportation.  The HEA did advise Ms. Pridget's attorney on August 27 that Baltimore City Public Schools students could ride public transit for free for the remainder of that week, and the attorney passed that on to Ms. Pridget.  But because there was no indication that parents of young children like T.W. would be able to ride for free with them, as well as on their

8

own to and from drop-offs and pickups, this offer was of little help to the family.

The impact of Defendants' failure to provide transportation in violation of McKinney-Vento is undeniable. T.W. has suffered disruptions to his education.  He missed two days of school the first week because Ms. Pridget did not have money to transport him and would have missed much more but for Ms. Pridget's own efforts to transport him herself.  Since the second week, he has been attending regularly but is frequently late because it is difficult for Ms. Pridget to shuttle him to and from school while also making sure that her other son, K.P. , is ready to go to his own school.  Noticing the pattern of tardiness, his school therapist suggested at one point that T.W. consider transferring if he is not able to come to school on time, an outcome which would be particularly unfortunate – and entirely contrary to the school stability objective of McKinney-Vento – because it is the school system's own failure to provide legally-mandated transportation that has resulted in his lateness.  Also distressing is the impact on the family as a whole.  Ms. Pridget's twice daily 11-mile roundtrip to and from T.W.'s school comes at a cost of $12.48 per day, nearly a quarter of her household's sub-poverty-level income of $1,044 per month.  As a result, she has been unable to purchase basic living necessities like shoes for her children, pay down utility and other debt, and save money to facilitate an eventual move into permanent housing.  Worse still, Ms. Pridget has been unable to participate in a work program mandated by the Department of Social Services as a condition of her receipt of Temporary Cash Assistance, and is now facing the complete termination of that assistance, which would reduce her family's income by almost half.  The situation is illustrative of the far-reaching impact of Defendants' continued inability to implement effective systems to meet homeless students' basic

educational needs.

### B. Plaintiff J.G. and Tamitha Grinder[5]

J.G. is eight years old.  She and her mother, Tamitha Grinder, have cycled in and out of homelessness since 2010, after the death of Ms. Grinder's mother, who had been helping to support the family financially.  Because Ms. Grinder has a disability, she cannot work or earn enough to consistently afford permanent market rate housing.  She awaits a housing subsidy voucher in order to be able to secure permanent housing which she hopes will occur later this year.

J.G. and Ms. Grinder moved into Sarah's Hope emergency shelter in January 2012 after being evicted from a room they rented briefly in the Brooklyn/Curtis Bay neighborhood.  Ms. Grinder wanted to keep J.G. at the school she had been attending, Curtis Bay Elementary, since she had been doing well and had many friends there, and because she hoped to eventually return to permanent housing in the area.  When she explained her situation, the school did allow J.G. to stay and arranged transportation for her, but the process took seven to ten days. *Compare* Ex. 4, Poolson Decl.

During the spring of 2013, J.G.'s class went on three or four field trips, and each one required parents to pay a fee.  Ms. Grinder called the school to remind her of the family's homelessness and ask for assistance but was denied.  As a result, on at least one occasion, Ms. Grinder had to borrow money to pay for a fee, and on another occasion, J.G. missed the field trip altogether.  No one ever provided Ms. Grinder a written decision explaining the denial.

_____

[5] The facts regarding J.G. are detailed in Ex. 2, Grinder Decl.

This fall, J.G. has not received school transportation.  Initially, this may have reflected a mistake on the part of the shelter, which had informed the school system that J.G. was transferring, but since the first day of the academic year, the delays have been entirely the result of Defendants' inadequate systems and procedures.  Ms. Grinder called Curtis Bay on August 26, when school started, to confirm that J.G. would be continuing there and that she needed transportation. The secretary, Ms. Deal, stated that she would input a request but that it would take seven to ten business days to process. Since then, J.G. and Ms. Grinder have endured the same pattern of administrative inertia confronted by T.W. and Ms. Pridget and countless other homeless families:

- During the first week of September, Ms. Grinder contacted the Office of Transportation to follow up on the request, but was told that that they had no record of it.  Transportation staff refused to process her request and directed her to contact her daughter's school.

- The same afternoon, Ms. Grinder visited Curtis Bay and met with the principal, Ms. Cornish, and an administrator, Mr. Nolan. Mr. Nolan entered a new request for transportation, which he said would take seven to ten more days to process.

- Approximately seven to ten days later, Ms. Grinder again called the Office of Transportation to learn why transportation had not begun.  She was told yet again that J.G. was not in their system, and again that she should call Curtis Bay.

- Ms. Grinder inquired about transportation at the school yet a third time, and Ms. Deal entered a third request, explaining it would take yet another two weeks for transportation to start.

- On September 17, Ms. Grinder spoke with the Office of Transportation and was told that J.G. was finally in their system but that it would take another seven to ten business days for the request to be approved and routed.

- On September 19, Ms. Deal informed Ms. Grinder that she believed the request had been approved but she did not know when transportation would start.

*Compare* Ex. 4, Poolson Decl. The school provided J.G. with a public transit pass to use until school transportation began, but it did not provide any similar assistance to Ms. Grinder, even though J.G. is too young to ride alone. When Ms. Grinder asked about getting tokens, she was told that the school cannot help parents with transportation. As a result, Ms. Grinder has generally had to pay $3.50 to $4.80 per day to take J.G. to and from school, a substantial amount for a family with an income of $455 per month.

Time is another cost.  Ms. Grinder must spend almost her entire day commuting to and from J.G.'s school. She has no time left to visit her doctor about her various medical conditions or take care of her family's basic needs.  Also, the commute itself is extremely difficult for her physically; walking to and from the bus stop several times each day aggravates severe pain she has in her feet and legs because of diabetes. The pain was so bad on one occasion that Ms. Grinder could not take J.G. to school at all, and also had to miss an important meeting with the Department of Social Services, jeopardizing her family's only source of income. Given the ongoing nature of her condition, these same harms are likely to recur.

**C**. **Plaintiffs X.M., T.M., F.S., B.S. - Uniforms**[6]

---

[6] The facts regarding the Mason and Scott children are detailed in Ex. 3, Mason Decl.

Plaintiffs X.M., T.M., F.S., and B.S. have lived with their baby brother and their mother, Ariel Mason, at the Salvation Army Booth House emergency shelter since August 2013, after the family was evicted.  X.M., age fourteen, attends Baltimore Community High School; T.M. , age eleven, attends Harlem Park Middle School; and F.S., age five, and B.S., age four, attend Mary Ann Winterling Elementary.   The children's schools have all adopted uniform codes.

Because Ms. Mason is homeless and cannot afford uniforms, she asked each of her children's schools for assistance with purchasing them either before or early in the school year. In late August, Mary Ann Winterling refused to provide her with any assistance for F.S. and B.S..  In early September, Harlem Park gave her one pair of pants and one shirt for T.M.  but nothing more.   Ms. Mason had to rely on a friend to purchase additional clothing for all three children, and even so, each one has only one or two uniforms total, not nearly enough for a whole school week.  *Compare* Ex. 4, Poolson Decl. ¶ 9.

The most difficult experience of all was with Baltimore Community High.  This school's uniform is particularly complex; students are expected to wear dress pants, a shirt with a logo, a black belt, and black dress socks and shoes.  On the first day, when X.M. came to school out of uniform, he was made to go home.  When Ms. Mason explained to a staff person that the family was homeless, she was told that X.M. could return when she could afford a uniform.

Taking these cold words to heart, X.M. stayed home for the remainder of the week, missing a full four days of class.  Only because a staff person at the Booth House called an administrator on the family's behalf was he able to return, early the following week.  The administrator permitted X.M. to go to class and gave him one belt and one shirt in response to

13

the family's request for assistance, but just a few days later, that same administrator told X.M. that he could not return if he did not have the proper shoes.  Fearful that her child would be kicked out once more, Ms. Mason spent $40 on the shoes, and reiterated her plea for help.  She was given a price list to take to the District Office.

Defendants' District Office has not been much more helpful than the schools on this matter.  When Ms. Mason first contacted someone in the District Office at the direction of the Baltimore Community High administrator, she was told that uniforms were the school's responsibility.  Only on September 17 did the HEA suggest that she might be able to help with uniforms although, since then, the issue remains unresolved.  Ms. Mason has relied on friends and borrowed money so she can purchase her children a few more items, but they continue to have no choice but to go to school out of uniform or in unclean uniforms several times throughout the week.  She worries that they feel badly about dressing differently from everyone else because they constantly ask her about getting new uniforms.  In Ms. Mason's words, when children feel stigmatized at school, "it is only a matter of time before they stop going."

### D.      Plaintiffs F.S. and B.S. – Access to Field Trips

Defendants have recently erected a new barrier to F.S.'s and B.S.'s full participation in school activities: a $10 per child fee for an upcoming trip on September 26 to a farm.  Ms. Mason asked staff at the children's school for a fee waiver on the basis of her homelessness but, as of September 20, the deadline for payment, the issue remained unresolved.  The principal at the school requested to speak with Ms. Mason's attorney before making a decision, a response that suggests that homeless parents who do not have the assistance of an attorney or other

advocate are likely to face outright denials. With six days until the trip, Ms. Mason unable to pay, and school staff so far unwilling to grant a waiver, there is a strong possibility that the children will miss the opportunity altogether.

## IV.   INJUNCTIVE RELIEF IS IMPERATIVE TO PROTECT THESE HOMELESS STUDENTS' RIGHTS TO CONTINUOUS PUBLIC EDUCATION

To establish their entitlement to a preliminary injunction, plaintiffs must demonstrate that: (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; (4) an injunction is in the public interest. *See Real Truth About Obama, Inc. v. Federal Election Com'n*, 575 F.3d 342, 346 (4th Cir. 2009), *vacated on other grounds*, 599 U.S. 189 (2010). If plaintiffs succeed on all four of these showings, they are entitled to preliminary injunctive relief. *See id*.

Applying this analysis, Plaintiffs are entitled to a temporary restraining order and preliminary injunction requiring the prompt provision of timely and appropriate transportation for Plaintiffs T.W. and J.G.; providing Plaintiffs X.M., T.M., F.S., and B.S. each with sufficient school uniforms to last a full school week; and allowing Plaintiffs F.S. and B.S. to participate in their school's September 26 field trip without paying fees. Finally, Plaintiffs and the class they seek to represent are entitled to a preliminary and permanent injunction enjoining Defendants from violating the Act.

### A.  Plaintiffs Are Likely to Succeed on the Merits

As a first step, plaintiffs seeking injunctions must "make a clear showing that they are likely to succeed at trial," though they "need not show a certainty of success." *Pashby v.*

*Delia*, 709 F.3d 307, 321 (4th Cir. 2013).  The plaintiffs in this case can show a strong likelihood of success on the merits.

### 1.   Defendants Fail to Promptly Provide Transportation

Essential to its guarantee of school stability for homeless students are the provisions in McKinney-Vento relating to transportation.  Under McKinney-Vento, LEAs must provide transportation to homeless students in two circumstances: (1) where it is necessary to facilitate the student's continued attendance at his or her school of origin, 42 U.S.C. § 11432(g)(1)(J)(iii), and (2) any time the LEA provides transportation to other students at that school, so as to ensure that homeless students receive "comparable" access to services.  *Id.* at § 11432(g)(4)(A). LEAs must also ensure that homeless students and parents are "fully informed of transportation services, including transportation to the school of origin . . . and [are] assisted in accessing transportation to the school that is selected . . . ."  *Id.* at § 11432(g)(6)(A)(vii).

Plaintiffs will succeed in demonstrating that Defendants' policy and practice as they relate to transportation are wholly inadequate to comply with McKinney-Vento.  For one, Defendants' expressly stated policy of requiring seven to ten business days to provide transportation, without any consistent, adequate measures for interim transportation support, leaves homeless students to get to and from school on their own for a full two weeks after making a request.  Two weeks is no insignificant length of time.  In Baltimore City, it comprises about twenty-percent of a marking period, and a student who is absent for that duration is considered a "habitual truant" under the law.[7]  Even worse, as illustrated by the experiences of

---

[7] See Baltimore City Public Schools, School Calendar: 2013-14, *available at*,

Ms. Pridget and Ms. Grinder and corroborated by homeless shelter staff, homeless students'

transportation requests are frequently pending for much longer than that.    All said, homeless

families often end up waiting many weeks for school transportation while parents like Ms.

Pridget and Ms. Grinder struggle financially and physically to take children back and forth, and

children, like T.W. and J.G., miss and arrive late to school.  *See* Ex. 1, Pridget Decl. ¶ 6-21; Ex.

2, Grinder Decl. ¶ 6-19; *See also* U.S. DEP'T OF EDUCATION, EDUCATION FOR HOMELESS

CHILDREN AND YOUTH PROGRAM: NON-REGULATORY GUIDANCE 20 (2004)[8] (describing

transportation as the "number one barrier" to homeless students' education and continuation in

their schools of origin, and recommending strategies by which LEAs and schools should improve

transportation); U.S. DEP'T OF EDUCATION, EDUCATION FOR HOMELESS CHILDREN AND YOUTH

PROGRAM REPORT TO CONGRESS (1997) (concluding that the most commonly reported reason

that homeless children are absent from school is a lack of transportation to or from the temporary

residence).

Defendants' policy and practice of delaying transportation for a prolonged and indefinite

period after a homeless student or parent asks for it is far from adequate to meet their obligations

under McKinney-Vento.  Specifically, Defendants are failing to "ensure that transportation is

provided, *at the request of* the parent or guardian," 42 U.S.C. § 11432 (g)(1)(J)(iii) (emphasis

---

http://www.baltimorecityschools.org/cms/lib/MD01001351/Centricity/Domain/6/2013-14-
DownloadableCalendar.pdf.  *See also* COMAR 13A.08.01.04 (defining "habitual truant" as a
sstudent who is unlawfully absent from school for more than 20 percent of the school days
within any marking period, semester, or year).

[8] *Available at*, http://www2.ed.gov/programs/homeless/guidance.pdf (last visited September 20,
2013).

added), to ensure that families are "assisted in accessing transportation to the school that is selected," *id.* at § 11432(g)(6)(A)(vii), remove barriers to homeless students' retention and success, *id.* at §§ 11432(g)(1)(I), 11431(4), 11432(g)(7)(A)-(B) (mentioning transportation-related barriers specifically),  and to "immediately" enroll students by assuring their attendance and full participation in school activities. *Id.* at § 11432(g)(3)(C)(i); *see also* NATIONAL CENTER FOR HOMELESS EDUCATION, TRANSPORTING CHILDREN AND YOUTH EXPERIENCING HOMELESSNESS 3 (2012)[9] ("because the Act requires homeless students to be provided immediate school enrollment, defined as attending classes and participating fully in school activities, LEAs must arrange transportation *without delay*") (emphasis added).

It does not have to be this way.  Many LEAs are able to arrange transportation for homeless students much more rapidly than seven to ten school days.  *See, e.g.,* PRINCE GEORGE'S COUNTY PUBLIC SCHOOLS, ADMINISTRATIVE PROCEDURE 5010: HOMELESS CHILDREN AND YOUTH – SCHOOL ACCESS AND SERVICES 12 (2012) ("Transportation arrangements for homeless students must be made as quickly as possible but in no event more than three (3) school days after receiving the request").  Indeed, in Defendants' case, shortening the timeline for arranging transportation may simply be a matter of cutting unnecessary red tape, and training staff to recognize the importance of this service to the education of their neediest students.

**2. Defendants Perpetuate Barriers to Homeless Students' Access to School and School Activities through their Policy and Practice Related to School Uniforms and Fee Waivers**

At the heart of McKinney-Vento is a directive to LEAs to proactively develop, review,

---

[9] *Available at*, http://center.serve.org/nche/downloads/briefs/transportation.pdf (last visited September 18, 2013).

and revise policies "to remove barriers to the enrollment and retention of homeless children and youths." 42 U.S.C. § 11432(g)(1)(I).  LEAs must not simply react when homeless students confront a barrier to participation, they must affirmatively identify and dismantle all such barriers.

"Uniform or dress code requirements" are expressly identified in the statute as a likely impediment to homeless students' enrollment.  42 U.S.C. § 11432(g)(1)(H)(v); *see also* Federal Enrollment Guidelines at 10700.  Homeless students find it difficult to adhere to uniform requirements for various reasons: uniforms, particularly those that are formal or customized, are more expensive than standard children's clothing, they are often available only at certain stores, they are school-specific (and sometimes grade-specific) such they cannot easily be given or received as hand-me-downs, and students must purchase new uniforms if they change schools. *See generally, e.g*., BALTIMORE CITY PUBLIC SCHOOLS, CHOOSE YOUR SCHOOL: 2013-14 (listing uniform requirements at middle and high schools).[10]  Given that the majority of their schools have adopted a uniform requirement,  Defendants must have in place an effective, systematic strategy for ensuring those requirements do not undermine homeless students' attendance either by saddling the students' families with expenses they cannot afford, forcing them to endure delays while traveling to multiple locations to secure uniforms or related assistance, fill out redundant paperwork, etc., or by  subjecting students to the stigma of not having a uniform when the rest of the student body does. *See* 42 U.S.C. § 11432(g)(1)(J)(i).

---

[10] *Available at*,
http://www.baltimorecityschools.org/cms/lib/MD01001351/Centricity/Domain/43/ChoiceGuide-English.pdf (last visited September 19, 2013).

Although Defendants state in regulation[11] that schools should provide homeless students free uniforms or uniform vouchers, they systematically fail to train or supervise school staff or provide them with adequate resources to ensure implementation of this regulation. Consequently, many schools – like the ones attended by Plaintiffs X.M. and T.M. and F.S. and B.S. – do not assist homeless families with the acquisition of uniforms.  The impact on families is illustrated by Ms. Mason's experience: when her children's schools refused to provide her with even the minimum number of uniform items they needed to get through the school week (or in the case of F.S. and B.S., any uniform assistance at all), she had to borrow money from her mother, solicit gifts from a friend, and dip into her own extremely limited funds to cover uniform costs.  Even then, she has sometimes had to send her children to school without a uniform, which has caused X.M. to be sent home one day and reprimanded another, and subjected all four of her school-age children to the stigma of dressing differently from all the other children in their school because they cannot afford the mandated clothing. Through this element of its practice, City Schools is violating its obligation to address barriers to homeless students' attendance and success arising out of uniform policies, and its obligation to avoid stigmatizing such students.  42 U.S.C. §§ 11432(g)(1)(H)(v), 11432(g)(1)(J)(i).

School-related fees also operate as financial barriers which prevent homeless students from "fully participating in school activities."  Federal Enrollment Guidelines at 10700.  For this

---

[11] JFE-RA:  HOMELESS STUDENTS – IDENTIFICATION, ENROLLMENT, SERVICES, AND DISPUTE RESOLUTION 6 (2013), *available at,* http://www.boarddocs.com/mabe/bcpss/Board.nsf/files/97STSA78BD3A/$file/JFE%20-%20RA%20-%20Homeless%20Students%20FINAL%202013%2005%2014.pdf (last visited September 20, 2013).

reason, the United States Department of Education has recommended that to comply with

McKinney-Vento, LEAs should work with state education agencies to waive a wide range of

fees on behalf of homeless students, including "course fees, activity fees, or field trip expenses."

*Id*.  Defendants, to their credit, advertise that they will waive fees on behalf of homeless students

for "field trips and any fees associated with school-related activities if that fee presents a barrier

to participation."[12]  However, their staff routinely deny or fail to offer fee waivers, as illustrated

by the experience of Ms. Mason, Ms. Grinder, and homeless children find themselves excluded.

Moreover, Defendants have limited the availability of waivers to "City Schools-sponsored"

programs, and   as a matter of explicit policy deny waivers to homeless students who participate

in extracurricular activities operated by outside vendors, even where the vendors contract with a

particular school or the school system to provide their services on-site exclusively for students of

Defendants' schools.  *See* Baltimore City Public Schools, Accessing Services: For Parents,

Guardians, and Unaccompanied Youth, http://www.baltimorecityschools.org/Page/22511 (last

visited September 20, 2013).  Denying waivers under these circumstances operates to exclude

homeless students from a wide range of school activities because a significant number of the

extracurricular programs in Defendants' schools – including, to name an example, the track team

at National Academy Foundation (NAF)[13] – are formally run by outside contractors, even though

---

[12] JFE-RA:  HOMELESS STUDENTS – IDENTIFICATION, ENROLLMENT, SERVICES, AND DISPUTE RESOLUTION 6 (2013), *available at*, http://www.boarddocs.com/mabe/bcpss/Board.nsf/files/97STSA78BD3A/$file/JFE%20-%20RA%20-%20Homeless%20Students%20FINAL%202013%2005%2014.pdf (last visited September 20, 2013).

[13] NAF's track team is operated by an outside partner, The McKim Center. http://www.baltimorecityschools.org/domain/7612.

they appear from students' and parents perspective to be a fully integrated part of a particular

school or the school system.   Defendants cannot avoid their obligation under McKinney-Vento

to make school programs accessible to homeless students by simply turning over operation of

these programs to outside entities.  *See, e.g., Ancata v. Prison Health Servs.,* Inc., 769 F.2d 700,

705 (11th Cir. 1985) (county could not avoid its legal duty to provide medical care to prisoners

by hiring an outside contractor to provide that care).  Defendants may certainly choose whether

to use such outside contractors, but if they do so, they must either require the contractors to

waive fees for homeless students, or pay such fees on the students' behalf.

### 3.  Defendants Fail to Inform Homeless Students of Their Rights

All three Plaintiff parents identified themselves as homeless to Defendants' staff at some

point during the current or past school year, an action which triggers Defendants' obligation to

inform the parents of "educational and related opportunities" and "all transportation services"

available to their children, and provide the parents with "meaningful opportunities to participate

in the education of their children" along with "referrals to healthcare services, dental services,

mental health services, and other appropriate services."  42 U.S.C. §§ 11432(g)(6)(iv),

11432(g)(6)(vii).  Defendants also have an obligation to disseminate notice about the rights of

homeless students throughout schools.  *See* 42 U.S.C. § 11432(g)(6)(A)(v)  However, the

Plaintiff parents did not receive the information to which they were entitled.  Ms. Mason was not

told, for example, that she had the opportunity to challenge the denial of uniform assistance by

her Defendants' schools.  See 42 U.S.C. § 11432(g)(3)(E), as implemented by COMAR

13A.05.09.07.  Ms. Grinder was not told after she became homeless (and identified herself as

such last year) that she did not have to pay fees for her daughter's school field trips, to the extent the fee presented a barrier to participation. *See* 42 U.S.C. § 11432(g)(6)(A).   Ms. Pridget was not told by Defendants' staff that, as an interim transportation measure (albeit an inadequate one), T.W. could ride public transit for free the first week of school; although her attorney gave her this information after receiving it from the HEA, no one at T.W.'s school was trained to relay it to her – or presumably to other homeless parents –  at the point where it was most relevant. The Plaintiff parents did eventually learn what they needed to know from shelter staff or advocates (although sometimes too late, as in the case of Ms. Grinder who found out about her right to field trip fee waivers only after she had paid fees and was forced to keep J.G. home from at least one trip). Many other homeless parents, however, particularly those who are doubled up with friends or relatives, are not as well-connected with sources of information outside of their children's schools.  Moreover, any homeless family's needs may change in a matter of days or weeks, as homelessness is inherently unstable and chaotic.  Defendants lack an effective system for advising all homeless families of all their rights and all of the supports and services they may need to rely on while homeless, promptly upon their identification as such.  A Plaintiff or other homeless student who needs school transportation now will likely need a fee waiver next month, and may need uniforms in the future.  Defendants have violated and are continuing to violate the Act by failing to assure that, as a matter of standard practice, homeless students and their parents receive information about all of their educational opportunities and rights.

    **4.**   **Defendants Fail to Afford Plaintiffs Access to an Administrative Dispute Resolution Process**

Under McKinney-Vento, state departments of education and LEAs must establish a process for resolving disputes with homeless students and families.  42 U.S.C. § 11432(g)(3)(E).  LEA homeless education liaisons (in this case, the HEA) must further ensure that families receive notice of this process, and that disputes are mediated according to its requirements.  *Id.* at § 11432(g)(6)(A)(v)-(vi).  Maryland has at the state level implemented this McKinney-Vento requirement through the process set forth at COMAR 13A.05.09.07, which covers disputes relating to enrollment, school selection, and services.

Defendants have not advised any of the Plaintiffs of their dispute resolution rights upon identification or upon the denial of requested services.  When Ms. Mason was denied uniform assistance by her children's schools, she was not provided a written decision or explanation of an appeal process.  Likewise, Ms. Grinder was not afforded her dispute resolution rights when J.G.'s school denied her fee waivers for field trips.  To the extent that the prolonged delay in the provision of transportation to both J.G. and T.W. constitutes a denial of transportation, at least a temporary one, Defendants should have provided written decisions and an opportunity to appeal here as well. They did not, and in failing to do so, multiplied their ongoing violations of McKinney-Vento.

### B.  Plaintiffs Will Suffer Irreparably Without Injunctive Relief

The second requirement for preliminary injunctive relief, a showing of "irreparable harm," is easily satisfied here.  *Real Truth*, 575 F.3d at 347.   Plaintiff children have experienced, are experiencing, or imminently will experience disruptions to their education and exclusion from school activities as a direct result of Defendants' systematic violations of McKinney-Vento.

24

These threats to their access to and stability in school have the potential to cause long-lasting injury which post-hoc damages or other relief cannot cure.

### 1.      Academic Disruption Creates Irreparable Harm

Public education is a core American institution, as Defendants would surely agree.  In the words of our Supreme Court, education constitutes "the very foundation of good citizenship . . . [I]t is a principal instrument in awakening the child to cultural values . . . and in helping him to adjust normally to his environment . . . [I]t is doubtful that any child may reasonably be expected to succeed in life if he is denied this opportunity." *Brown v. Bd. of Education*, 347 U.S. 483, 493 (1954).  Of course, for education to be meaningful, it must be consistent; students who are forced to miss substantial amounts of school or frequently switch schools may not ultimately learn much at all. *See* ROBERT BALFANZ & VAUGHAN BYRNES, THE IMPORTANCE OF BEING IN SCHOOL: A REPORT ON ABSENTEEISM IN THE NATION'S PUBLIC SCHOOLS 4 (2012)[14] (concluding, based in large part on studies of Baltimore City students,  that chronic absenteeism significantly increased achievement gaps at all school levels and that there is a strong link between sixth-grade attendance and on-time graduation from high school).

It is for these reasons that courts routinely conclude that the potential for educational interruption constitutes irreparable harm.  *See, e.g., Phillip v. Nat'l Collegiate Athletic Ass'n*, 960 F. Supp. 552, 558 (D. Conn. 1997) (finding that student would suffer irreparable harm where loss of athletic scholarship would cause educational disruption or delay); *Martin v. Wing*, 1996

---

[14] *Available at*, http://new.every1graduates.org/wp-content/uploads/2012/05/FINALChronicAbsenteeismReport_May16.pdf (last visited September 19, 2013)

WL 191974 *3 (N.D.N.Y. 1996) (hospitalized special education student suffers irreparable harm as a result of, *inter alia*, educational interruption); *Petties v. Dist. of Columbia*, 881 F. Supp. 63 (D.D.C.1995) (schools' faulty payment practices, which led to termination or interruption of special educational placements, caused irreparable harm); *Cronin v. Bd. of Educ. of East Ramapo Cent. School Dist.*, 689 F. Supp. 197, 204 (S.D.N.Y. 1988) ("A cessation of a handicapped child's schooling and the accompanying loss of educational, vocational and social development constitutes irreparable injury."); *Ross*, 500 F. Supp. at 934 ("The Court further finds that interruption of a child's schooling causing a hiatus not only in the student's education but also in other social and psychological developmental processes that take place during the child's schooling, raises a strong possibility of irreparable injury.").

For homeless students, eliminating or minimizing interruptions to education is especially important because schools often serve as a source of stability in lives which are otherwise unpredictable or chaotic.  And when these students' schooling is not stable, such as in the case of frequent absences or transfers, the academic consequences can be devastating.  *See* U.S. DEP'T OF EDUCATION, EDUCATION FOR HOMELESS CHILDREN AND YOUTH PROGRAM: NON-REGULATORY GUIDANCE at 14 (concluding that with respect to homeless and other highly mobile students, "it can take a student four to six months to recover academically after changing schools"); Yvonne Rafferty & Marybeth Shinn, The Impact of Homelessness on Children, American Psychologist, Nov. 1991, at 1175.[15] Courts have for this reason concluded that homeless students will suffer irreparable harm if denied attendance at school.  *See N.J. v. New*

---

[15] *Available at* http://webpage.pace.edu/yrafferty/yvonne/Rafferty1991AmPsychol.pdf (last visited September 19, 2013)

*York*,  872 F.Supp.2d 204, 214 (E.D.N.Y. 2011); *Orozco by Arroyo v. Sobol,* 674 F. Supp. 125,

128 (S.D.N.Y. 1987) ("Interruption of a child's schooling[,] causing a hiatus not only in the

student's education but also in the other social and psychological development processes that

take place during the child's schooling, raises a strong possibility of irreparable injury").  Indeed,

this Court has on two occasions entered preliminary injunctions in order to ensure school

continuity for homeless children.  *See Maleesa Collier, et al.*, *v. Bd. of Educ. of Prince George's*

*County*, *et al.*, No. DKC 2001-1179 (D. Md. April 30, 2001), *Stephenie Bullock, et al.*, v. *Bd. of*

*Educ. of Montgomery County*, *et al.*, No. DKC 02-0798 (D. Md. May 2, 2002),

### 2.  The Plaintiff Children Are Suffering or are at Substantial Risk of Suffering Academic Disruption

The Plaintiff children are suffering or at grave risk of suffering academic disruption as a

result of the Defendants' systematic failure to comply with McKinney-Vento.  Both T.W. and

J.G. have missed and arrived late to school as a direct result of Defendants' ongoing refusal to

provide adequate transportation.  X.M. too missed four days of school because he could not

afford the required uniform, an experience which is likely to repeat itself in the future, given his

own continuing lack of a sufficient number of uniforms and the school's demonstrated

willingness to enforce its uniform code strictly even against homeless families.  His sisters, T.M.,

F.S., and B.S., are meanwhile subject to stigma on a day-to-day basis because of their frequent

need to come to school dressed out-of-uniform.  Moreover, F.S. and B.S. now also face potential

exclusion from the first field trip of the school year with their new teachers and peers.   The

potential for irreparable harm is clear: if these children face continuing disruptions to their

education, they are at risk of academic underachievement or failure and the lifelong

consequences that come with that.

### C.  The Balance of Hardships Clearly Favors Issuing an Injunction

As required to satisfy the third element of entitlement to injunctive relief at this stage, the

balance of hardships tips in Plaintiffs' favor.  *Pashby*, 709 F.3d at 329.  Without an injunction,

Plaintiff children will experience interruptions to their education in the form of repeated

absences and lateness, social stigma, and possible involuntary transfer, and  Plaintiff parents will

experience ongoing emotional and financial distress as they see their children stigmatized, worry

about their academic progress, and spend their limited funds on transportation and activity fees.

With an injunction, the only "hardship" that Defendants may arguably experience is the need to

expend funds and staff resources to immediately provide transportation, fee waivers, and

uniforms.  The Fourth Circuit has made clear, however, that the need to spend money to protect

the basic rights of vulnerable individuals is not enough of a hardship to preclude preliminary

injunctive relief.  *See id*. (in challenge by low-income, disabled patients to operation of state's

Medicaid program, rejecting government agency's opposition to a preliminary injunction on

grounds that the injunction would cost the agency money).  In short, "the benefit to the plaintiff

children of uninterrupted education during their formative middle and high school years, due to

circumstances outside of their control, far outweighs the harm to the District in continuing their

enrollment," including by providing transportation and full access to school and school activities.

*N.J.*, 872 F.Supp.2d at 214.

### D.      It is in the Public Interest to Ensure That Homeless Children Have Full Access to School and Educational Continuity

Ensuring the consistent school attendance of the state's students is a public priority for

Maryland.  All Maryland children who are five years old and older and under the age of 16 must

attend school *regularly* during the entire school year.  Md. Code Ann., Educ. § 7-301.  Indeed,

school personnel are expected to report to LEA leadership the names of all children who "ha[ve]

been absent or irregular in attendance, without lawful excuse. . . ."  Md. Code Ann., Educ. § 7-

302. Clearly, Maryland law, like McKinney-Vento, reflects a public policy of promoting regular

and continuous school attendance among all students, including those who are homeless.

Attendance has been a priority for Defendants' own school system  A leader on the issue

around the state, Baltimore City Public Schools has among other things launched a public "Every

Day Counts!" campaign designed to educate students and families on the importance of regular

attendance, participated for the last several years in the Baltimore Student Attendance

Collaborative, whose mission is to decrease student absenteeism around the City; and revised its

student code of conduct to minimize the use of suspensions in order to better keep children in

school.[16]  Improving their current policy and practice with respect to the identification,

enrollment, and provision of support to homeless students, so as to ensure that such students can

access and remain in school without disruption, is thus fully in line with Defendants' own goal –

shared by the broader public community –  of increasing the attendance of the most vulnerable

students.

More generally, "a high quality education for all individuals and a fair and equal

opportunity to obtain that education are a societal good . . . and improve the life of every

---

[16] *See generally* BALTIMORE CITY PUBLIC SCHOOLS, CODE OF CONDUCT 2013-14  (2013),
*available at,*
http://www.baltimorecityschools.org/cms/lib/MD01001351/Centricity/Domain/87/2013_14-
Code-English-FINAL.pdf (last visited September 20, 2013)

individual, because the quality of individual lives depends on the quality of the lives of others."

*Elementary and Secondary Schools Act*, 20 U.S.C. § 6301 (2001).  Educating homeless students

in particular affords public benefits even beyond the positive externalities associated with

educating any child, as noted by Congress in enacting McKinney-Vento:

> Directing resources . . . towards the education of homeless children is one of the
> most important things we can do as a Congress. We talk so often about changing
> the cycle of poverty, trying to make sure that one generation does not follow
> another into poverty, into public assistance, and into dependency on the Federal
> Government.

136 Cong. Rec. H9246 (October 10, 1990) (statement of Rep. Miller).  By compelling

Defendants to ensure that Plaintiff children have uninterrupted and complete access to education,

putting them on track to become productive and conscientious citizens, this Court will benefit

not only the parties to this case, but society at large.

## V.     CONCLUSION

For the reasons set forth above, and upon the facts to be established at a hearing on this

motion, Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction should

be granted.

Respectfully submitted,


September 20, 2013                                  _____/s/_____
                                                   Debra Gardner (Federal Bar No. 24239)
                                                   PUBLIC JUSTICE CENTER
                                                   1 North Charles Street, Suite 200
                                                   Baltimore, MD 21201
                                                   (410) 625-9409
                                                   (410) 625-9423 facsimile
                                                   gardnerd@publicjustice.org


                                                   *Attorney for Plaintiffs*